CRAIN, Judge.
This is a dental malpractice action which resulted in a jury verdict in favor of defendant, Dr. Hunter, and judgment was rendered accordingly. On appeal, we held that although the trial court improperly excluded expert testimony with respect to the standard of care applicable to Dr. Hunter, its exclusion was not so prejudicial that its admission would have resulted in a favorable judgment for plaintiff. Therein we stated:
Even with the addition of the proferred testimony, the jury could have reached the same result without committing manifest error. Significantly, testimony to substantially the same effect as the prof-erred testimony was entered into evidence through the testimony of two general dentists called by plaintiff.... Accordingly, the error committed by the trial court in this respect does not warrant reversal.
McLean v. Hunter, 486 So.2d 816, 819 (La. App. 1st Cir.1986). The Louisiana Supreme Court found that the proferred testimony of Dr. Lovelace may have changed the outcome of the trial. Under these circumstances it was held that the jury verdict could be given no effect on appellate review. Accordingly, the case was reversed and remanded to this court for reconsideration of plaintiff’s appeal with the instruction that we consider all the evidence, including the proferred testimony, and make an independent determination of whether plaintiff has proved her case by a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298 (La.1986). We proceed in compliance with the Supreme Court instructions.
FACTS
Elaine McLean was initially treated by Dr. Hunter, a general dentist, on an emergency basis on December 6 and 7, 1977.
*773 The December, 1977, consultations are not alleged to have given rise to this malpractice action. McLean was next seen by Dr. Hunter on November 13, 1979, and was thereafter treated by him or in his office until September 9, 1981, when she was referred for treatment to Dr. Bruce Lovelace, periodontist, who performed periodontal surgery on plaintiff.
McLean alleges as malpractice Dr. Hunter’s failure to inform her that she suffered from periodontal disease; to refer her to a periodontist; to instruct her in proper oral hygiene techniques; and to properly treat the periodontal disease.
BURDEN OF PROOF
In a dental malpractice action the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by ... dentists ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances;
[[Image here]]
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La.R.S. 9:2794 A.
A. DEGREE OF CARE TO BE EXERCISED BY GENERAL DENTIST IN DIAGNOSING AND DETERMINING COURSE OF TREATMENT OF PATIENT WITH PERIODONTAL DISEASE
“Periodontium” refers to the tissues surrounding the teeth and includes (1) the cementum (connective tissue covering the root of a tooth which assists in supporting the tooth); (2) the periodontal ligament (which anchors the tooth to the bone); (3) the alveolar bone (jaw bone to which the teeth are attached); and (4) the gingiva (gums). The gingiva is not attached to the tooth at the gum line. It is attached to the root approximately three millimeters below the gum line, forming the gum crevice or sulcus between the gum line and the root. In its natural, healthy state, the gum crevice is approximately three millimeters deep. “Periodontitis” or “periodontal disease” refers to the “inflammatory reaction of the tissues surrounding a tooth (periodontium), usually resulting from the extension of gin-gival inflammation (gingivitis) into the per-iodontium.” DORLAND’S ILLUSTRATED MEDICAL DICTIONARY 991 (26th ed. 1981). Periodontal disease may result in the formation of periodontal pockets (with or without pus), resorption of the alveolar bone and cementum, destruction of the periodontal ligament and loss of teeth.
Periodontal disease in most instances is caused by poor oral hygiene by which tartar, calculus, and plaque cause inflammation. It can be acutely caused by an object, such as a popcorn husk, lodging in the periodontal pocket. It is also cyclical in nature.
Dr. Bruce Lovelace, McLean’s treating periodontist, testified that in treating periodontal disease a general dentist should: use a periodontal probe (a calibrated instrument) to measure the depth of periodontal pockets; record the pocket depths, if any, of each tooth; advise the patient that she has periodontal disease; instruct the patient on oral hygiene techniques; and set up regularly scheduled visits for the patient.
Dr. Bruce Kestler, general dentist, testified that in treating periodontal disease a general dentist should use a periodontal probe to measure periodontal pockets; give oral hygiene instructions to the patient; record the pocket depths if he is to treat the patient for periodontal disease rather than refer her to a periodontist; place the patient on a recall schedule; and advise the patient that she has periodontal disease.
Dr. Robert Branstetter, general dentist called by plaintiff, testified essentially that upon examination of the patient for perio *774 dontal disease, the clinician should measure and record the pocket depths; give oral hygiene instructions; and inform the patient that she has periodontal disease. He stated that a periodontal probe is the instrument of choice for examining and measuring periodontal pockets primarily because it makes the clinician’s work easier and faster. He testified, however, that examining, probing and measuring the periodontal pockets may be done by any instrument with which the clinician is familiar and by which he can probe and estimate the depth of the periodontal pockets. In Dr. Branstetter’s opinion, the measurement of a periodontal pocket may differ upon examination by different clinicians even when using a periodontal probe.
According to the testimony of various general dentists and periodontists, the purposes of charting or recording pocket depth are to motivate the patient into better oral hygiene practices and to monitor the disease process.
B. DEGREE OF CARE EXERCISED BY DR. HUNTER IN DIAGNOSING AND DETERMINING TREATMENT OF EXISTING PERIODONTAL DISEASE, AND DENTAL HYGIENE INSTRUCTIONS TO PLAINTIFF
Dr. Hunter testified that he uses an explorer, rather than a periodontal probe, to probe and measure periodontal pockets. The type of explorer used by Dr. Hunter is calibrated and he has used it during his twenty years of practice to estimate pocket depth. He stated that he probed and measured the periodontal pockets in McLean’s mouth with the explorer, and was aware that she had periodontal pockets associated with periodontal disease. Dr. Hunter testified that it is not his practice to record or chart every clinical finding and every procedure performed. He stated that although he did not record pocket depth and all details of plaintiff’s visits, he diagnosed the periodontal disease and monitored plaintiff's progress at each visit during the twenty-two months which she was treated at his office.
Plaintiff alleges Dr. Hunter did not inform her that she had periodontal disease; he did not instruct her in proper oral hygiene techniques; nor did he place her on a recall program by which she would be seen regularly in his office.
Dr. Hunter testified that it is not his normal practice to record when oral hygiene instructions are given or the substance of conversations between himself and a patient. Although he did not recall the exact times or dates that plaintiff was given oral hygiene instructions and told that she had periodontal disease, he recalled many conversations with plaintiff during which they discussed her “gum disease” and the importance of maintaining good plaque control, and numerous sessions when she was taught how to clean her teeth and gums. Additionally, Dr. Hunter stated that it is his routine practice to give oral hygiene instructions to every patient. Ms. Janelle Bello, a dental assistant employed by Dr. Hunter, testified that she recalled specifically teaching proper brushing and flossing techniques to plaintiff. She further testified that she heard Dr. Hunter discussing with plaintiff the importance of taking the responsibility of keeping her teeth and gums clean in order to control or arrest the periodontal disease with which she suffered. Plaintiff, on the other hand, testified that neither Dr. Hunter nor any office employee ever taught her how to clean her teeth and gums. She admitted on cross examination, however, that Dr. Hunter told her many times to brush her teeth, and to floss and massage her gums but never told her how it should be done.
Dr. Hunter testified that plaintiff was seen in his office as needed on an emergency basis and was also placed on a recall schedule. He did not remember specifically for what time intervals the recalls were set and his office did not keep appointment books dating back approximately five years. However, the dental record reflects that plaintiff was seen in Dr. Hunter’s office seventeen times during a twenty-two month period. Ms. Vickie Fredericks, a dental assistant employed in Dr. Hunter’s office, testified that it was common prac *775 tice to place every patient on a recall schedule. Additionally, she specifically recalled plaintiff coming in unscheduled late in the evening on several occasions for which she was not charged by Dr. Hunter and which were not noted on the dental records. Plaintiff also testified that she was treated by Dr. Hunter on several occasions which were not noted on her dental records.
Dr. Joseph Lawrence, periodontist and chief of the periodontics department at LSU Dental School, stated that treatment of periodontal disease at an early stage may prevent the development of excessively deep periodontal pockets, subsequent surgery and loss of teeth. We note it is undisputed that when plaintiff was seen by Dr. Hunter on November 13, 1979, she was already suffering from moderate to advanced bone loss associated with periodontal disease across the upper front teeth with moderate bone loss in isolated areas of the mouth. Therefore, when she was initially seen by Dr. Hunter on November 13, 1979, the disease was no longer in an early stage, but rather in the moderate to advanced phase. It is also uncontroverted that Dr. Hunter did not cause the periodontal disease and resulting bone destruction as evidenced on the November 13, 1979, panorex. No evidence was elicited that plaintiff had suffered additional bone loss between November 13, 1979, and September 9, 1981, when she was referred to Dr. Lovelace.
We find that Dr. Hunter exercised the degree of care required of a general dentist in diagnosing and determining treatment of existing periodontal disease, and also in the instructions to the plaintiff of the type of care necessary to prevent the further progression of the disease insofar as possible.
C. DEGREE OF CARE REQUIRED OF GENERAL DENTIST IN TREATMENT OF PERIODONTAL DISEASE
Dr. Alfred Broxson, associate professor of periodontology at LSU Dental School, testified that there are several schools of thought as to the proper course of treatment of periodontal disease. He stated that the periodontist treats inflammation, not periodontal pockets per se. The Keyes Technique, for example, advocates nonsurgical therapy by controlling bacteria in periodontal pockets which are less than six millimeters deep. Another treatment method involves periodontal surgery performed for the purpose of reduction or elimination of the periodontal pockets in order for the patient to adequately clean the pockets and thereby avoid inflammation.
Dr. Lovelace examined plaintiff on September 16, 1981, and diagnosed her condition as chronic, generalized moderate to advanced periodontitis. He initially considered treatment by nonsurgical intervention but decided that course of treatment would be ineffective because plaintiff had several deep periodontal pockets. In his opinion, periodontal surgery (flap surgery) is the treatment of choice in patients having periodontal pockets deeper than six millimeters because a clinician does not have the manual dexterity to clean and scrape the root at that depth. The purpose of periodontal surgery is to clean and scrape the root in order to reduce inflammation, to attempt to reattach the tissues and to eliminate or reduce the periodontal pockets so that the patient is more easily able to keep them clean. Dr. Lovelace and Dr. Broxson have observed slippage in plaintiff’s condition since the surgery. Plaintiff again has some four, five and six millimeter periodontal pockets. Dr. Lovelance had not ob-servéd plaintiffs condition in November, 1979, or during her twenty-two month course of treatment by Dr. Hunter. He expressed the opinion that initially nonsurgical intervention would probably have been an appropriate course of treatment. However, the treating dentist should consider that the patient will eventually have to undergo periodontal surgery.
In the opinion of Dr. Anthony Dijohn, general dentist, Dr. Hunter’s treatment of plaintiff’s periodontal disease was commensurate with the standard of care.
Dr. Lawrence testified as to the time frame in which a general dentist should treat periodontal disease before recommending periodontal surgery to the patient:
*776 This is a difficult question.... So much of it is dependent on the patient and what they present with. There is no ideal time, other than one would like to wait perhaps as long as one could to make sure that what you do locally might treat the problem for you, but probably just as importantly, to make sure that the patient is able to practice good plaque control, if they cannot, then there is really no need to do periodontal surgery because you can predict that it will fail because the cause has not been eradicated....
I do think that probably the majority of the cases two months, three months might be an acceptable range, and I can think of probably a hundred exceptions to that time frame that I just gave you, because of patient conditions, patient health, patient finances, difficulty in controlling some of the local factors that you have. But probably two or three months might be a generalization I can give you.
D. DR. HUNTER’S TREATMENT OF THE PERIODONTAL DISEASE
Dr. Hunter testified that in his professional judgment it was appropriate that plaintiffs periodontal disease be initially treated conservatively by nonsurgical intervention to attempt to avoid or postpone surgery. Plaintiff was not properly cleaning her teeth, she was suffering financial difficulties and the anterior teeth had the greatest periodontal involvement. In his experience in addition to the expense and cosmetic problems resulting from the surgery, patients often experience slippage or recurrence of the disease after the surgery.
The course of nonsurgical intervention followed by Dr. Hunter included use of nutritional supplements, oral hygiene instructions, cleaning, scraping, root planing, occlusal adjustments, curettage, gingivo-plasty and gingivectomy. Upon realizing that plaintiff was not maintaining good plaque control and the periodontal disease was not arrested she was referred to Dr. Lovelace for possible periodontal surgery.
Plaintiff was treated by Dr. Hunter for periodontal disease beginning in November, 1979. In January, 1981, Dr. Kestler, a general dentist, examined plaintiff and found a periodontal abscess. At that time Dr. Kestler advised plaintiff that she should see a periodontist. However, she went back to Dr. Hunter’s office. Dr. Hunter drained the abscess at no charge. Plaintiff testified that she discussed Dr. Kestler’s advice about periodontal disease and periodontal surgery with Dr. Hunter on that date. Plaintiff stated:
Dr. Hunter asked me if I was told the ramifications of this particular type of gum treatment, gum procedure. I told him that I was not. He proceeded to tell me that this particular type of procedure would leave me with my teeth looking longer and that I would have a deformed look about my teeth, that I did not need this procedure.
Dr. Hunter referred plaintiff to Dr. Lovelace, a periodontist on September 9, 1981.
We find that Dr. Hunter’s treatment of plaintiff’s periodontal disease and the time of his referral met the standard of care required by a general dentist.
E. DEGREE OF CARE OF DR. HUNTER IN SPECIFIC TREATMENT OF PLAINTIFF
Among the various acts which plaintiff alleges constitute malpractice are Dr. Hunter’s treatment of periodontal abscesses on teeth numbers 7 and 18, the extraction of tooth number 7 and the subsequent bridgework performed to replace tooth number 7.
The record reveals that Dr. Hunter drained a periodontal abscess on tooth number 7, an upper right lateral incisor, on December 19, 1979. On December 26, 1979, he drained a periodontal abscess on tooth number 18. On January 2, 1980, he extracted tooth number 7 because, in his opinion, it was too loose to save due to bone loss. He performed occlusal adjustments on January 17 and 28, 1980, and February 11, 1980.
On cross-examination in reference to the extraction of tooth number 7, plaintiff stat *777 ed that she asked Dr. Hunter whether the tooth could be saved and he responded that since it was so close to the Christmas holidays they would wait until after the holidays and determine whether the situation improved. She then asked Dr. Hunter what was the problem with her abscessed teeth and testified that she didn’t remember his giving her a “clear-cut answer.” Dr. Hunter stated that he has never pulled a patient’s tooth without telling the patient why it should come out and without obtaining that patient’s permission to do so.
Dr. Kestler, general dentist, testified that on an emergency visit, the puncturing or draining of a periodontal abscess is commensurate with the standard of care. However, flap surgery should be performed on the abscessed tooth at a later visit. Failure to subsequently perform flap surgery on an abscessed tooth is below the requisite standard of care.
Dr. Lovelace testified that appropriate treatment of a periodontal abscess by a general dentist consists of draining the abscess then treating the etiology of the inflammation or disease. The root of the tooth should be planed to remove tartar or calculus and the periodontal pocket should be cleaned out. Where periodontal pockets are deeper than six millimeters, in his opinion, flap surgery should be performed.
Dr. Lawrence testified that the proper treatment of periodontal abscesses requires the treating dentist to determine whether the tooth can be retained. If it can be retained, the abscess should be drained, either by an incision or by curettage. Oc-clusal adjustments should be made, if necessary. The patient should return in one to two weeks for evaluation of whether additional therapy is required. He stated that periodontal surgery following drainage of an abscess is often, though not always, required. The failure to perform periodontal surgery prior to tooth extraction is not necessarily below the standard of care if the clinician determines that the prognosis of the tooth is hopeless.
Dr. Anthony Dijohn, general dentist, testified that the extraction of tooth number 7 by Dr. Hunter was above the requisite standard of care.
Dr. Hunter testified that after the extraction of tooth number 7 plaintiff had a gap in the anterior region of her mouth. He constructed a permanent bridge and anchored it to tooth number 8 which was periodontially involved. Prior to anchoring the bridge he performed a bridge prep which included curettage to rid tooth number 8 of diseased material. He stated that he chose to use a permanent bridge, rather than a temporary one, because a permanent bridge is easier for the patient to clean than a temporary bridge and its cost is the same as a temporary bridge. Additionally, Dr. Hunter charged plaintiff half of his regular price for the permanent bridge because he was aware that she was suffering financial difficulties at the time.
Dr. Lovelace testified that the attaching of a permanent bridge on a periodontially diseased tooth is below the requisite standard of care.
Dr. Dijohn, general dentist, testified that approximately fifty percent of his practice involves tooth extraction and bridgework. He stated that he frequently must bridge over to a tooth which is periodontially diseased. If the only abuttment is periodon-tially involved and the patient wants a tooth, he stated, the clinician often has no other choice but to do so. In his opinion, this practice is commensurate with the standard of care.
Dr. Lawrence testified that it is questionable practice to anchor a bridge on a perio-dontially diseased tooth only because the prognosis of the diseased tooth is questionable. The bridgework does not hinder or prevent treatment of the diseased tooth, or of periodontal disease in general.
We find that the specific treatment by Dr. Hunter of teeth numbers 7 and 18 was within the standard applicable to a general dentist.
CONCLUSION
After carefully considering the evidence we find that although Dr. Hunter did not use a periodontal probe to measure plain *778 tiff’s periodontal pockets, nor did he record their depth, he did probe and measure them with a calibrated instrument with which he was familiar. He diagnosed that she suffered from periodontal disease, informed her of that fact and instructed her on proper oral hygiene techniques on several occasions. He also monitored plaintiffs progress during her frequent office visits.
Apparently, plaintiffs primary contention is that Dr. Hunter should have either performed periodontal (flap) surgery or referred plaintiff to a periodontist for flap surgery at an earlier date. We find, however, that the nonsurgical therapy instituted by Dr. Hunter prior to referring her for periodontal surgery was commensurate with the standard of care.
The bone loss which plaintiff suffered as of November 13, 1979, had occurred over a long period of time, possibly even commencing during her adolescence. She suffered no additional bone loss during the period of time she was treated by Dr. Hunter. In the words of Dr. Lawrence, Chief of the Department of Periodontics at LSU Dental School, it is extremely difficult to establish a rigid time frame in which periodontal surgery, rather than nonsurgical intervention, should be performed due to the many variables to be considered.
Additionally, even were we to find that the treatment provided by Dr. Hunter was inappropriate, which we expressly do not, we find that plaintiff failed to prove by a preponderance of the evidence that her present condition, oral hygiene practices and aesthetic appearance were the proximate result of the actions or inaction of Dr. Hunter. Plaintiff also failed to prove by a preponderance of the evidence that less extensive periodontal surgery would have been required as a proximate result of actions or inaction by Dr. Hunter.
The bone loss suffered by plaintiff could not be restored even with periodontal surgery. Plaintiff did not suffer additional bone loss during her course of treatment by Dr. Hunter. Despite the periodontal surgery, plaintiff is experiencing slippage and deepening of the periodontal pockets, at no fault of the periodontist. Such is the nature of the disease.
Any alleged embarrassment, pain or suffering and inconvenience plaintiff has suffered is a result of the periodontal disease itself, not the actions or inaction of Dr. Hunter.
We further find that plaintiff failed to prove by a preponderance of the evidence that Dr. Hunter’s treatment of plaintiff’s periodontal abscesses, subsequent extraction of an abscessed tooth and the bridgework were not commensurate with the standard of care or that plaintiff suffered any injuries as a result thereof.
For the foregoing reasons the judgment of the trial court is affirmed. All costs are to be paid by plaintiff.
AFFIRMED.