606 So.2d 980 (1992)
Douglas Graham DONALDSON et al., Plaintiffs-Appellants,
v.
UNIVERSAL ENGINEERING OF MAPLEWOOD, INC., et al., Defendants-Appellees.
No. 91-458.
Court of Appeal of Louisiana, Third Circuit.
October 6, 1992.
*982 Hunter & Boland, Hank De Bordes, Jr., Baton Rouge, for plaintiffs-appellants.
Scofield, Gerard, Veron, Hoskins & Soileau, Scott Scofield, Lake Charles, for defendants-appellees.
Before GUIDRY and LABORDE, JJ., and SALOOM, J. Pro Tem.
GUIDRY, Judge.
This is a derivative action brought by minority shareholders against the defendant corporation, Universal Engineering of Maplewood, Inc. (Universal), and its president and majority shareholder, James A. "Tony" Trumps. The plaintiffs are Douglas Donaldson, Edwin A. Bell, Sr., Dierdri Bell, Bobby Bell, T.F. Padden, Matteson Bell, Thelice Bell, Ruth Bell, Edwin A. Bell, Jr., and Miguele Hollingsworth, sometimes referred to, for purposes of this opinion, as the "Louisiana group".
The plaintiffs sought damages for the alleged diminished value of their minority interests in Universal, which they alleged was caused by Trumps and other members of Universal's board of directors. Specifically, plaintiffs claimed that the board failed to meet certain legal corporate notice formalities and that Trumps breached his fiduciary duty to the corporation and its shareholders by self-dealing, mismanagement and entering into transactions which were not in the best interest of the corporation. The principal transactions complained of involved the granting of an option and the eventual sale of Royal Pines Country Club (RPCC), which at the time of the option and sale was owned primarily by Universal.
The trial court found no violation of corporate notice requirements under the Louisiana Business Corporation Law. In addition, the court determined that Trumps had not breached his fiduciary duty to the corporation or its shareholders and dismissed plaintiffs' suit. This appeal followed.

FACTUAL BACKGROUND
On December 13, 1977, Trumps entered into an option agreement with Walter Rodgers, Sr. to purchase all of the corporate stock of Royal Pines Country Club (RPCC), Royal Pines Country Club Estates, Inc. (RPCCE), and a real estate agency, Tideland Development Company, Inc. (Tideland). Rodgers was the original developer and owner of the country club, the subdivision and the owner of Tideland. RPCC's principal asset was a golf course and RPCCE's principal asset was the subdivision development, both of which were located on Lady Island, South Carolina. On January 27, 1978, Trumps entered into an agreement captioned "Contract of Sale" with Walter I. Rodgers, Sr. and Edith M. Rodgers, Walter's wife. The Rodgers agreed to transfer to Trumps and other investors all the stock of RPCCE and 86% of the stock of RPCC for $993,000, with a closing date for the sale set for March 1, 1978. Apparently, this "Contract of Sale" is similar to what is commonly referred to in Louisiana as a purchase agreement.
Universal was incorporated as a Louisiana corporation on February 8, 1978, with its registered office located in Sulphur, Louisiana. One hundred shares of $10 par value stock were authorized and issued to the original shareholders on March 9, 1978.[1]
In the meantime, the closing on the Rodgers sale took place as scheduled on March 1, 1978 in South Carolina. Closing documents included in the appellate record reflect that Universal acquired all the stock of RPCCE. Universal contemporaneously assumed the promissory note and mortgage *983 entered into by RPCCE in favor of the Rodgers family.[2] The principal amount owed on the note was $774,750 payable in monthly installments of $6,082.56.
The record is sketchy concerning how Trumps gained control of Universal. It appears from plaintiffs' brief that, sometime in 1980, a Dr. Mixon Bankston acquired 34% and Trumps acquired 16% of Universal stock. Subsequently, five more shares were issued to Boyce Head. On February 22, 1986, the shareholders of Universal (led by Trumps, Bankston, and Head) deleted Article XI of the articles of incorporation removing the right of first refusal reserved to the corporation and stockholders on any stockholder's sale of stock. Trumps then acquired the shares of Bankston and Head and, by doing so, acquired a controlling interest in Universal. Also at this meeting, the board of directors was expanded from three to five members, and Donaldson, Bankston, Trumps, Head and Matteson Bell were elected directors. No minutes of this February 22, 1986 shareholders meeting are included in the record.
At the time of this meeting, RPCC was operated by Rodwell, Oliver, Deans and Co., Inc. pursuant to an option to purchase agreement dated October 10, 1985. Also at this time, Tideland, which was wholly owned by Trumps, was exclusively marketing the real estate surrounding the golf club. Rodwell, Oliver, Deans, and Co., Inc., in a letter signed by C.J. Deans dated August 5, 1986, advised Dr. Mixon Bankston of their intent to renew the option for an additional six month period. The option agreement contained a $100,000 renewal fee plus the continuation of the $6,200 monthly rental fee. However, subsequently, Trumps was advised by Rodwell of Rodwell, Oliver, Deans and Co., Inc. that the option would not be renewed nor would it exercise its existing option to purchase RPCC.
On August 20, 1986, at a special meeting of Universal's board of directors, Trumps indicated that the Rodwell, Oliver, Deans, and Co., Inc. option renewal had fallen through and he was pursuing a potential sale of RPCC to Richard Tremblay and Lanny Snode. Trumps noted some opposition to this sale from Donaldson, who, in Trumps' words, wanted a delay period to search for a more lucrative purchase offer. The board members present approved continued negotiations with Tremblay-Snode. At another special meeting of the Universal board held September 7, 1986, this intent was reaffirmed. The minutes of that meeting reflect Trumps' understanding that the price for RPCC and the subdivision would be approximately $1,200,000. Apparently, each of these meetings was called by Trumps in his capacity as majority shareholder and board member. From the minutes, it is unclear which board members were present at these two meetings.
On November 1, 1986, Bankston and Trumps issued notice to the stockholders pursuant to Article V, paragraph G of Universal's articles of incorporation that Boyce Head was being replaced by Blanche Trumps, wife of James A. Trumps, as a member of the board of directors of Universal. The article relied upon provides:
"G. Upon the written request of stockholders holding 51% of the voting stock of this corporation issued and outstanding, any member of the Board of Directors of this corporation may be replaced by a director designated by such stockholders in writing at any time, whether or not his term of office shall have expired."
At the time of this meeting, Trumps either owned or controlled 51.25% of Universal's voting stock.
A special Universal shareholders meeting was held on November 11, 1986. Present at the meeting were Trumps and Tideland Development Company, Inc., represented by its secretary, Blanche Trumps. The *984 minutes of that meeting reflect that Bankston resigned by proxy and was replaced as Universal's president by Trumps. On the same day, Bankston was also replaced as a board member by Christi Trumps Lee, Trumps' daughter, pursuant to the aforementioned Article V, paragraph G shareholder notice. Blanche Trumps was also appointed secretary of the corporation upon the resignation of Boyce Head from that position. These notices were sent to Universal's office in Sulphur and were not sent to each individual shareholder.
On November 15, 1986, Universal entered into an option agreement with Tremblay-Snode. The agreement called for Tremblay-Snode to manage the day-to-day operations of RPCC, including maintaining and upgrading the golf course and running the clubhouse and restaurant. The option to purchase the club for $1,200,000 from Universal was to remain open for 18 months. The option agreement also provided that, if the sale eventually took place, Tideland would receive a $120,000 commission on the sale. The agreement further provided that Trumps was retained by Tremblay-Snode as RPCC president at a salary of $1,000 per week.
Plaintiffs filed this suit on August 25, 1987 alleging that Trumps breached his fiduciary duty to Universal by negotiating the commission for Tideland, negotiating for and collecting the $1,000 weekly salary from the club, and failing to take advantage of a possibly more lucrative offer to purchase RPCC. The Louisiana group also alleged that Trumps failed to observe corporate formalities in the process of changing the board of directors and negotiating the option with Tremblay-Snode. They asked for monetary damages to compensate Universal for its alleged loss.
In 1988, Tremblay-Snode exercised their option to purchase the country club property through their corporation, Golf Professionals Club, Inc. The parties executed an agreement of purchase and sale on September 9, 1988, a copy of which was proffered by the plaintiffs at trial.[3]
As a result of the negotiations and sale, Trumps and his family personally benefited. Included among the benefits were a free lifetime membership in the Golf Professionals Club, free golfing privileges for themselves and their son, half-price food, health insurance benefits, and reduced prices in the pro shop. The agreement also included a $120,000 commission for Tideland on the sale. In exchange, Tremblay-Snode allegedly secured a relatively low interest rate and delayed principal payments until the third year following the purchase.
At trial, Trumps testified that, although he did not notify each shareholder individually concerning the changes in Universal's corporate structure in late 1986, the shareholders were kept abreast of what was occurring. Notice of board changes were sent to Universal's office in Sulphur. He stated that, since he owned a majority of the stock and had control over the board, he felt it was his prerogative to operate Universal as he saw fit. He admitted that Blanche Trumps signed notices and minutes of meetings as secretary of Universal before being elected or appointed to that position. It was, according to Trumps, understood that she would soon be appointed secretary. He claimed that all legal formalities were not met because he was most concerned with keeping the club afloat and was working long hours to do so.
Trumps also stated that, although Deans did represent that Rodwell, Oliver, Deans, and Co., Inc. intended to renew their option in August of 1986, Rodwell later refused to do so. Because Rodwell was considered by Trumps to be the sole financial source for the group, Trumps was forced to look elsewhere for someone to operate and/or purchase the club. According to Trumps, the *985 club was over $170,000 in debt and had lost many memberships while under Rodwell's control. It was at this point that he decided to pursue Tremblay-Snode. He admitted that, at the time he contracted with Tremblay-Snode, he was aware that a certain Mike Kiester of Florida was also interested in purchasing RPCC for possibly $2.2 million. However, he had only spoken to Kiester once on the phone, and Kiester had never seen RPCC. Trumps felt that, in the face of a firm offer from Tremblay-Snode, it would be imprudent to pursue Kiester, whom he characterized as a "tentative prospect".
After the option to Tremblay-Snode, Trumps, as president of RPCC, worked at the club on a daily basis trying to arrange the finances and records of the club and pay off its creditors. Trumps stated that he negotiated deals with most creditors to accept 50% of what was owed them by RPCC. Rodwell agreed to pay this reduced outstanding debt. In Trumps' estimation, he earned the $1,000 per week salary provided him by the option agreement by improving the club's financial stability and status. Additionally, he pointed out that his salary was approved by RPCC's board of directors, of which he was a member. At the time Trumps served as president of RPCC, Universal owned 96% of RPCC's outstanding stock, and he, in turn, owned a majority of Universal's outstanding stock.
Trumps further explained that the "perks" he and his family received were necessary to facilitate marketing of real estate and memberships in the club. As sole owner of Tideland, which retained exclusive marketing agency status over all real estate included in the subdivision, it was important that he be able to market the property by showing the club and treating prospective purchasers to a round of golf. He stated that the privileges negotiated in the purchase and sale agreement were not abused by himself or his family. Trumps also stated that, as of the trial date, he had yet to receive the $120,000 commission for Tideland on the sale of RPCC.
Blanche Trumps fully corroborated the testimony of her husband. She further stated that the notices and meeting minutes were a secondary concern in relation to the preservation of the club as a financially stable entity.
Christi Trumps Lee testified that, in her three year tenure as a Universal board member, she never received notice of a board meeting nor did she ever attend a board meeting. However, she did vote on the sale of RPCC to Tremblay-Snode. In all affairs of Universal, she deferred to her father's business judgment.
Douglas Donaldson, plaintiff, testified that, since being elected to the Universal board of directors on February 22, 1986, he had never been advised of or attended a board meeting or shareholders meeting. He took no part in the Tremblay-Snode negotiations and was not aware that the option had been granted until he received a copy of the paperwork from a third party. Donaldson never did personally deal with the business of the club and only visited once, during February of 1987. He also never personally dealt with Mike Kiester, the prospective purchaser from Florida.
Richard Tremblay testified by deposition that, when he and Snode took over RPCC, the membership level was down and playing conditions on the course were poor. He stated that he and Snode ran the day-to-day operations of the club, while Trumps was responsible for the finances, accounting, and payment of taxes. During negotiations for the sale, he and Snode were reluctant to grant Trumps any personal benefits as part of the deal, but decided to do so instead of losing what they had already invested in the club during the option period. In addition, Tremblay pointed out that the "perks" were given to Trumps in exchange for the more favorable mortgage financing terms which Trumps had offered. According to Tremblay, as of mid-1990, the club was in terrific shape both financially and in terms of playing conditions.
Carl Hendricks, the South Carolina attorney who represented Universal and RPCC in the period after the sale from the Rodgers family, testified by deposition that all directors were at least aware of the meetings. He stated that, as in most closely *986 owned corporations, Universal did not follow the formal regulations of notice of meetings and corporate action. He did not recall if all notices of meetings were sent to directors and shareholders, respectively, as required by law. Hendricks' office prepared the minutes of Universal's board and shareholder meetings which he characterized as accurate accounts of what took place. Hendricks stated that, in his opinion, the persons in the Louisiana group were not truly shareholders since their initial investments were in the form of loans for which the corporation issued notes payable. Hendricks stated that he participated in the sale of RPCC from Universal to Tremblay-Snode. At the time, it was his understanding that the Louisiana group had no capital investment in Universal and that Trumps represented Universal solely as majority shareholder.
The trial court, in written reasons for judgment concluded that the shareholder consent notices which changed the Universal board members on November 1, 1986 and November 11, 1986, respectively, were in compliance with the requirements of La. R.S. 12:76(C). That statute, the judge reasoned, requires "prompt notice" only and not specifically "written notice". The court concluded that the notice given Universal's shareholders was sufficiently prompt and reflected corporate action taken in compliance with Article V, Paragraph G of the articles of incorporation. Additionally, the trial court ruled that plaintiffs failed to present evidence sufficient to show a breach of fiduciary duty on the part of Trumps.
From this judgment, plaintiffs appeal and assign three errors which raise the following two issues for our consideration on appeal: first, whether Universal's board of directors was properly constituted; and, second, whether Trumps breached his fiduciary duty to Universal and its shareholders.

OPINION

I. Was Universal's board of directors properly constituted?

Plaintiffs assert on appeal that Trumps failed to give the requisite notice of the shareholder's action in replacing Dr. Mixon Bankston and Boyce Head with Christi Trumps Lee and Blanche Trumps, respectively, on the Universal board of directors. Specifically, they contend that each shareholder was entitled to receive written notice of the November 1986 actions taken pursuant to Article V, Paragraph G of Universal's articles of incorporation. In support of this contention, plaintiffs argue that, because other articles of Title 12, Part VII require written notice to shareholders, La.R.S. 12:76 should also be construed to require written notice. In this connection, plaintiffs do not seek to have any of the corporation's actions declared invalid but only seek monetary damages.
Whether proper notice was sent to the shareholders is, in our view, irrelevant to a final determination of whether plaintiffs are entitled to monetary damages. However, we will address plaintiffs' contention.
A distinction must be made between shareholder meetings, which are governed by La.R.S. 12:73, and shareholder consent, which obviates the necessity of a meeting and is governed by La.R.S. 12:76. Article V, Paragraph G, supra, contemplates corporate action taken by consent of the shareholders, which is governed by La.R.S. 12:76. That statute provides as follows:
"A. Whenever by any provision of law, the articles or the by-laws, the affirmative vote of shareholders is required to authorize or constitute corporate action, the consent in writing to such corporate action signed by all of the shareholders having voting power on the particular question, shall be sufficient for the purpose, without necessity for a meeting of shareholders.
B. If the articles provide that such a consent may be signed by fewer than all of the shareholders having voting power on any question, the consent need be signed only by shareholders holding that proportion of the total voting power on the question which is required by the articles or by law, whichever requirement is higher.

*987 C. The consent, together with a certificate by the secretary of the corporation to the effect that the subscribers to the consent constitute all or the required proportion of the shareholders entitled to vote on the particular question, shall be filed with the records of proceedings of the shareholders. If the consent is signed by fewer than all of the shareholders having voting power on the question, prompt notice shall be given to all of the shareholders of the action taken pursuant to the consent." (Emphasis ours).
As allowed by paragraph (B), Article V, paragraph G of Universal's articles provides for corporate action to be taken by fewer than all shareholders having voting power in order to remove and replace a director. Specifically, it provides that such action can be accomplished by the written request of at least 51% of the ownership interest of Universal. When a director is replaced by this method, paragraph (C) requires that all shareholders be sent prompt notice of the action taken.
The trial court concluded that La. R.S. 12:76 did not explicitly require written notice, only prompt notice. This statutory interpretation is correct. While statutes in pari materia should be construed together, when the legislature includes a requirement in one statute and excludes it from another, the legislative intent to not impose the requirement on those affected by the second statute is clear. La.C.C. art. 17; Hoffpauir v. City of Crowley, 284 So.2d 114 (La.App.3rd Cir.1973), writ denied, 286 So.2d 366 (La.1973).
The trial judge found that notice was sufficiently prompt in this case to meet the requirements of La.R.S. 12:76(C). We do not find this factual conclusion to be clearly wrong. Rosell v. Esco, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Both actions taken by consent of Universal shareholders were evidenced by a document captioned "NOTICE". Trumps and his wife both testified that these documents were sent to Universal's office in Sulphur. Furthermore, they both stated that all the shareholders were well aware of the replacement of Bankston and Head because Trumps kept them apprised by phone of the actions taken. This testimony was corroborated by Hendricks, the defendants' South Carolina attorney. The trial court is vested with great discretion in the evaluation of the credibility of witnesses, to which we are required to defer in the absence of manifest error. Id.
We conclude that, in this situation, defendants complied with the notice requirements of La.R.S. 12:76(C) and, as such, Universal's board of directors was properly constituted.

II. Did Trumps breach his fiduciary duty to Universal and its shareholders?

Plaintiffs contend that the trial court erred in finding that Trumps did not breach his fiduciary duty to Universal and its minority shareholders. La.R.S. 12:91 provides, in pertinent part:
"Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions...."
The case law interpreting this article was succinctly summarized by Judge Plotkin, concurring in part and dissenting in part, in Dunbar v. Williams, 554 So.2d 56 (La.App. 4th Cir.1988):
"Louisiana law imposes upon corporate officers and directors a fiduciary duty to the corporation and its shareholders when an officer or director contracts with the corporation. The transaction is subject to close judicial scrutiny to ensure that no violation of fiduciary duty is involved. Groves v. Rosemound Improvement Ass'n. Inc., 490 So.2d 348 (La.App. 1st Cir.), writ denied, 495 So.2d 304 (La.1986).
The authority to act on behalf of a corporation can only be conferred by the charter or bylaws of the corporation or *988 by resolution of the board of directors. McKendall v. Williams, 467 So.2d 1301 (La.App. 4th Cir.1985). The office of president in itself confers no power to bind the corporation or control its property. Fluidair Products Inc. v. Robeline-Marthaville Water System, 465 So.2d 969 (La.App. 3d Cir.1985).
The person acting in the fiduciary capacity bears the burden of establishing that his transactions were legitimate. Normat Industries Inc. v. Carter, 477 So.2d 783 (La.App. 5th Cir.1985). By law, the interested director must show not only that the action was fair to the corporation, but also that it was essentially an `arms length' transaction. Quartana v. Jenks, 436 So.2d 1335, 1337 (La.App. 5th Cir.), writ denied 441 So.2d 1224 (La.1983); House of Campbell v. Campbell, 172 So.2d 727 (La.App. 4th Cir.1965)."
Plaintiffs claim that Trumps breached his fiduciary duty by engaging in self-dealing (accepting the option period salary, negotiating and using the personal benefits for himself and his family, and requiring a $120,000 commission on the sale of RPCC for Tideland which was wholly owned by Trumps) and mismanagement (failing to pursue the Rodwell, Oliver, Deans, and Co., Inc. option renewal and failing to pursue a potentially more lucrative sale to Kiester). They also assert that the trial court erroneously placed the burden of proof on plaintiffs to prove breach and resulting prejudice to their interest instead of upon Trumps to prove that the transactions were legitimate. Trumps, in brief, concedes that the trial court applied the burden on the wrong party, but he urges that the evidence adduced at trial was nonetheless sufficient to establish the transactions were legitimate.
It is well settled that an appeal is taken from final judgment, not from written reasons for judgment which are the trial court's explanations of determinations made. It is, however, not improper for the Court of Appeal to consider written reasons for judgment in determining whether the trial court erred. State in the Interest of Mason, 356 So.2d 530 (La.App. 1st Cir. 1977). A review of the lower court's written reasons for judgment reveals that the trial judge did indeed erroneously place the burden on the plaintiffs rather than the defendant.
By analogy, in the situation where a jury is given an incorrect instruction on the law applicable to a particular case, no weight is accorded the trial court's judgment implementing the tainted verdict. The appellate court must then independently review the complete record and decide the case under the preponderance of the evidence standard. See McLean v. Hunter, 495 So.2d 1298 (La.1986), on remand, 510 So.2d 771 (La.App. 1st Cir.1987), writ denied, 513 So.2d 1206 (La.1987); Thomas v. Missouri Pacific Railroad Co., 466 So.2d 1280 (La.1985); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). The same principles should apply to a bench trial in which the trial court explicitly applies the wrong burden of proof. In this situation, the error of law is even more egregious than when the court wrongfully instructs a jury on the burden of proof. Accordingly, we will independently review the record without being bound by the customary "manifest error/clearly wrong" standard of appellate review.

Self-Dealing.
The law governing transactions in which an officer has a personal interest or derives personal benefit is provided in La. R.S. 12:84. It establishes the criteria for voiding a contract when the officer or director engages in self-dealing. The statute provides, in pertinent part, as follows:
"A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the *989 meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
. . .
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders."
Clearly, this statute's purpose is to regulate transactions between a corporation and any other business where interested directors or officers could possibly gain personally at the expense of the corporation's best interest.
Trumps received a salary of $1,000 per week while employed as president of RPCC from November 15, 1986 through September 9, 1988. The salary was approved by the RPCC board of directors, of which Trumps controlled, as Universal's majority shareholder. Trumps testified that he worked every day of his employment at the club. His main duties included straightening out the RPCC financial records and assuring that all amounts in arrears owed to creditors were paid. He testified that the books had been neglected for the prior six years and straightening out the accounts was an enormous task. His wife corroborated his testimony as did Tremblay. Under these circumstances, we hold that Trumps did not violate his fiduciary duty to Universal by negotiating for and accepting a $52,000 per year salary as RPCC president. Clearly, someone had to do the job and Trumps performed satisfactorily at that job. The salary was reasonable and fair to Universal given the complexity of the task and the amount of time expended.
Trumps also negotiated and received several personal benefits or "perks" as a result of the September 9, 1988 sale of RPCC to Tremblay-Snode. These benefits, he and his wife explained, were necessary for Trumps to successfully market the adjoining real estate lots for Tideland. Furthermore, Trumps stated the perks were also in the best interest of RPCC and Universal because they made marketing the property easier. This, in theory, led to a greater volume of and quicker sales. Tremblay testified that the perks were granted to Trumps in direct exchange for the more favorable financing terms. We conclude that the perks granted to Trumps and his family were reasonable in relation to the task of marketing country club lots and were fair to both Universal and RPCC.
In the option and sale agreements, Trumps secured a $120,000 commission for Tideland on the sale of RPCC to Tremblay-Snode (a commission of 10% on the $1,200,000 sales price). The record reflects that the Universal board approved the commission. However, it was approved at a meeting attended only by Trumps and his wife. As sole owner of Tideland, Trumps alone stood to gain from this commission. He testified that such a commission was customary in the real estate listing business. The alleged listing agreement between Universal and Tideland is not made a part of the record. The record does not indicate who Trumps represented in negotiations with Tremblay-Snode, i.e., whether he was acting as CEO of Universal or as owner-president of Tideland in securing the commission. In any event, there is no evidence of what Trumps or Tideland actually did to earn this large commission on the option and subsequent sale.
It is obvious that it was in Universal's best interest to realize as much revenue from the sale of RPCC as possible. Because of the commission to Tideland, granted at the sole direction of Trumps, this goal was not accomplished. Therefore, we hold that Trumps failed to prove that the commission was fair to Universal and that it was an "arms length" transaction.

Mismanagement.
Each of the plaintiffs' mismanagement claims are not meritorious. Trumps "failure" to secure renewal of the Rodwell, Oliver, Deans, and Co., Inc. option was, in actuality, the result of Rodwell refusing to renew the option on RPCC. The decision was Rodwell's alone and, once final, there was practically nothing Trumps could do about it. Likewise, the Kiester sale prospect was nothing more than a preliminary *990 inquiry by a person who had never seen the club. In the face of a firm offer from Tremblay-Snode, it is apparent that Trumps exercised good business judgment in doing what was fair to Universal and RPCC at the time.

DECREE
For the above and foregoing reasons, the judgment of the trial court is reversed only insofar as it found no breach of a fiduciary duty by Trumps for negotiating a $120,000 commission in favor of Tideland on the sale of RPCC. It is hereby ordered that Tideland be precluded from receiving said commission. In all other respects, the judgment is affirmed. Costs of this appeal are to be paid one-half (½) by plaintiffs-appellants and one-half (½) by defendants-appellees.
REVERSED IN PART; AFFIRMED IN PART; AND, RENDERED.
NOTES
[1] Plaintiffs' exhibits nos. 4-13, the original stock certificates, show the following allocation of ownership interests:

(1) Douglas Donaldson 25 shares
(2) Ruth Bell 1 share
(3) Edwin A. Bell, Sr. 21.1 shares
(4) Matteson Bell 6.6 shares
(5) Dierdri Bell 4.6 shares
(6) Miguele Hollingsworth 2.8 shares
(7) Thelice Bell 2.8 shares
(8) Edwin Bell, Jr. 3.9 shares
(9) Bobby Bell 22.2 shares
(10) T.F. Padden 10 shares

[2] Though the record on appeal is not well documented in this area, it appears that RPCCE was set up by the purchasers as a holding or shell corporation wholly owned by Universal to better facilitate the sale. After the sale of RPCCE stock to Trumps, RPCCE assets and stock were apparently transferred to Universal. Trumps signed the promissory note in his capacity as president of RPCCE, the named debtor.
[3] This sale document was ruled inadmissible by the trial judge since it was executed after the plaintiffs' original petition was filed in 1987. The plaintiffs did not supplement or amend their original petition to allege any wrongdoing on the part of Trumps in connection with this sale agreement. The agreement was excluded on the basis that, if admitted, it would result in an expansion of the pleadings to the prejudice of the defendant. Plaintiffs do not challenge this ruling on appeal.