KAREN MOULTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

VERSUS

STEWART ENTERPRISES, INC., JOHN B. ELSTROTT, JR., THOMAS M. KITCHEN, ALDEN J. MCDONALD, JR., RONALD H. PATRON, ASHTON J. RYAN, JR., JOHN K. SAER, JR., FRANK B. STEWART, JR., AND SERVICE CORP. INTERNATIONAL, RIO ACQUISITION CORP.

* NO. 2020-CA-0090

* COURT OF APPEAL

* FOURTH CIRCUIT

* STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2013-05636 C\W 2013-05887, DIVISION "A"
Honorable Ellen M. Hazeur, Judge
* * * * * *
**Judge Joy Cossich Lobrano**
* * * * * *

(Court composed of Judge Terri F. Love, Judge Joy Cossich Lobrano, Judge Rosemary Ledet)

Andrew A. Lemmon
Scott J. Falgoust
LEMMON LAW FIRM, LLC
15058 River Road
Hahnville, LA 70057

David T. Wissbroecker
Robbins, Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

COUNSEL FOR PLAINTIFFS/APPELLANTS

Robert B. Bieck, Jr.
Mark A. Cunningham
Alexander N. Breckinridge, V
JONES WALKER, LLP
201 St. Charles Avenue, 49th Floor
New Orleans, LA 70170

Steven W. Usdin
Laurence D. Leseur
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, LLC
909 Poydras Street, 24th Floor
New Orleans, LA 70112

Pamela S. Palmer, Admitted Pro Hac Vice
PEPPER HAMILTON LLP
350 South Grand Avenue
Two California Plaza, Suite 3400
Los Angeles, CA 90071-3427

Edward J. Castaing, Jr.
Edward J. Lilly
CRULL, CASTAING & LILLY
601 Poydras Street
2323 Pan American Life Center
New Orleans, LA 70130

COUNSEL FOR DEFENDANTS/APPELLEES

**AFFIRMED**

**MAY 5, 2021**

This is a direct shareholder class action. Plaintiffs/appellants, Phillip Rosen and Alex Rodgers (collectively, the "Shareholder Appellants"), appeal the October 18, 2017 amended judgment of the District Court, which granted summary judgment in favor of defendants/appellees, Stewart Enterprises, Inc. (the "Company") and the seven members of its Board of Directors (the "Board"). The judgment on appeal dismissed the claims of all plaintiffs, including those brought by the class, Shareholder Appellants, and other named plaintiffs. For the reasons that follow, we affirm.

### *Factual and Procedural Background*

This litigation was initiated in 2013 by certain aggrieved shareholders, who initially sought an injunction to prevent a merger between the Company and a larger competitor, Service Corporation International, Inc. ("SCI") and its wholly owned subsidiary, Rio Acquisition Corp. ("Rio").[1] Before the merger, SCI was the largest funeral service provider in the United States, and the Company was the second largest. The merger involved a $1.4 billion transaction wherein SCI and

---

[1] Rio was formed as a subsidiary for the purpose of the merger transaction.

1

Rio acquired all of the Company's outstanding shares at a price of $13.25 per share. After the District Court denied injunctive relief and the merger was approved by more than 99% of the total shareholders, these aggrieved shareholders amended their petition to seek damages from the Company and the seven members of the Board:[2] John B. Elstrott ("Elstrott"), Alden J. McDonald, Jr. ("McDonald"), Thomas M. Kitchen ("Kitchen"), Ashton J. Ryan, Jr. ("Ashton Ryan"), Ronald H. Patron ("Patron"), John K. Saer ("Saer")(collectively, the "Named Directors"), and Frank B. Stewart, Jr. ("Stewart").[3] They alleged that the process was unfair and riddled with conflicts of interest, such that either the Board should have negotiated a better share price for the shareholders or the Company should not have been sold. Two of these aggrieved shareholders appealed the summary judgment dismissing their claims, and they are referred to in this opinion as Shareholder Appellants.

The dispute revolves around Stewart, who was the Chairman of the Board at the time of the merger. The Company was founded more than 100 years ago, was incorporated in Louisiana, and was Stewart's family business. Stewart had grown up in the family business and had feelings of personal pride and attachment to Company-operated properties, particularly those in the New Orleans area where he lived. The Company became publicly traded on the NASDAQ stock market in the 1990's. At the time of the merger, the Company offered two classes of stock, Class

[2] As the Shareholder Appellants' theories of liability against the various directors differ, in this opinion, we refer to the Board of Directors as a whole as the "Board," Frank B. Stewart, Jr. as "Stewart," and the remaining six directors other than Stewart, collectively, as the "Named Directors."

[3] Additional details of the early procedural history are discussed in this Court's prior opinion. *See Moulton v. Stewart Enterprises, Inc. ("Moulton I")*, 17-0243, pp. 1-3 (La. App. 4 Cir. 8/3/17), 226 So.3d 569, 571.

A common stock (one vote per share) and Class B common stock (ten votes per share). Stewart owned all of the Company's Class B common stock. At the time of the merger, Stewart was the largest individual shareholder, and through his holdings he held approximately 11% ownership and 36% voting power. This voting power allowed Stewart to block any corporate action that required a two-thirds vote of shareholders, but as he was not a majority owner or majority voter, he could not force any Board or shareholder action singlehandedly.

Shareholder Appellants argue that the Board breached its fiduciary duty to shareholders in several ways. They claim that Stewart was so difficult to work with that the Named Directors engineered the merger to be rid of Stewart. Shareholder Appellants contend that the Named Directors were so beholden to Stewart that, in an effort to have the merger completed, the Board ignored better options to grow, acquire smaller competitors, and increase the share price, and that the Board failed to include sufficient information in the proxy statement in anticipation of the shareholder vote. They argue that Stewart had a conflict of interest, because he hoped the merger would provide him with an opportunity to buy certain properties in New Orleans, Mobile, Dallas, and Los Angeles that the combined company may be required to divest to obtain federal antitrust approval. According to this argument, Stewart orchestrated a "side deal" for himself by leading the Board away from an opportunity to acquire a smaller private competitor ("Potential Seller"), so that Potential Seller could purchase divested properties and Stewart could invest personally in Potential Seller.

The following timeline of events is pertinent to our consideration. On June 25, 2008, SCI made an unsolicited offer to acquire the Company for $9.50 per share. In July 2008, SCI announced said offer publicly in a strategy sometimes referred to as a "bear hug."[4] On July 21, 2008, SCI increased its offer to $11.00 per share. The Board formed a Special Committee to negotiate with SCI and consider any additional proposals or alternatives. The 2008 Special Committee was comprised of Patron, Ashton Ryan, McDonald, and two directors who later left the Board, Michael Read and James McFarland. During this period, Stewart recognized a potential opportunity to buy certain properties if the Federal Trade Commission ("FTC") required their divestiture as a condition of antitrust approval. Stewart approached SCI's Chief Executive Officer, Tom Ryan, expressing his interest in said properties if divested. Nevertheless, on October 7, 2008, SCI unilaterally withdrew its offer in the wake of the national credit market collapse. No other interested parties contacted the Company with a proposal to purchase the Company in 2008, and the Company continued to operate on a standalone basis.

In 2012, Potential Seller entered into discussions with the Company. Stewart was fond of Potential Seller's CEO, and at that time, Stewart favored the idea of acquiring Potential Seller and retaining its CEO as CEO of the Company. These

---

[4] A "bear hug" is a type of pressure technique in merger and acquisition negotiations that can be viewed as aggressive, especially where an offer letter is made public. *See* Craig M. Wasserman & Larry S. Makow, Financial Institutions Developments: Current Issues in Financial Institutions Mergers and Acquisitions, 4 No. 7 M & A Law. 9 (2000). "In the bear hug approach, the acquiring corporation makes an offer directly to the managers or board of directors of the target corporation to acquire the target corporation at a fixed price." E.C. Lashbrooke, Jr., Asymmetric Information in Mergers and the Profits of Deceit, 28 Loy. L.A. L. Rev. 507, 537 (1995). "Target directors are forced to disclose the offer to their shareholders, creating pressure on the directors to accept." *Id.*

discussions spanned approximately one year, during which period Potential Seller furnished the Company with various financial information, but Potential Seller never provided the Company with a price at which it was willing to be acquired.

On December 5, 2012, the Board received a letter from Tom Ryan in which SCI offered to purchase all of the Company's stock for $10.00 per share. Kitchen, Stewart, and Stewart's personal financial advisor John McNamara ("McNamara")[5] had all received telephone calls from Tom Ryan during the previous month, advising them that the offer letter was forthcoming. At this time, the Company had a seven-member Board: Stewart, Kitchen, Elstrott, McDonald, Ashton Ryan, Patron, and Saer. On December 12, 2012, the Board met and formed the Special Committee to consider SCI's proposal and strategic alternatives. The Special Committee was comprised of five "outside" non-employee directors: Saer, Elstrott, McDonald, Ashton Ryan, and Patron. Kitchen was not included because as the Company's CEO, he was a Company employee and "inside" director, such that his continued employment was implicated in considering the merger. The Board minutes also reflect that Stewart was not included in the Special Committee as it was thought that he "may be presented with actual or potential conflicts of interest in evaluating the SCI proposal and other strategic alternatives." The Special Committee retained Goldman Sachs as its financial advisor and the Jones Walker

---

[5] McNamara is not a defendant. He had at one time been a Company director, but was not one in 2012 or thereafter. McNamara held no formal role within the Company organization during this period. He nevertheless regularly attended Board meetings with the Board's permission in his capacity as personal financial advisor to Stewart. As discussed further in n. 20, *infra*, McNamara's compensation from Stewart was tied to increases in Company share price to incentivize McNamara to give Stewart financial advice that would drive Company shareholder value.

law firm as its legal advisor. The Special Committee met 17 times between January 2013 and May 2013 to discuss SCI's proposal and alternative strategies, including continuing as a standalone company and pursuing a possible acquisition of Potential Seller. The Special Committee negotiated increases in SCI's offer price from $10.00 to $13.25 per share. The proxy statement reflects that the "volume weighted price per share for the 30 calendar days ending May 23, 2013 [was] $8.97."

In April 2013, Stewart spoke with Tom Ryan and told him that he was open to a sale if the Special Committee negotiated one. Stewart, accompanied by McNamara, communicated this conversation to the Board in its April 18, 2013 meeting and asked if the Board would consider giving Stewart an option to buy certain operations. The Special Committee instructed Stewart and McNamara to leave the meeting, met immediately in executive session, decided the answer was "no," reconvened with Stewart and McNamara, and instructed Stewart to refrain from any communication with SCI until and unless terms of a merger were fully negotiated with SCI. Stewart agreed. The Special Committee required SCI to represent in the merger agreement that it had no separate agreement of any kind with Stewart. Tom Ryan also testified SCI did not have any "special arrangements" with Stewart.

On April 26, 2013, the Special Committee unanimously resolved that prior to recommending the merger to the Board, Saer and Kitchen would speak to Stewart and McNamara to ascertain whether Stewart would vote in favor of the

merger. On April 29, 2013, Stewart confirmed that he was comfortable with a $13.00 share price and was also comfortable with the Special Committee negotiating a higher price.

As of May 24, 2013, the merger terms had been fully resolved. As a condition of the merger, SCI required that Stewart sign a voting agreement committing not to block the proposed merger and to commit 29.99% of his shareholder voting power in favor of the merger. Stewart agreed to this. Stewart requested and received permission from the Special Committee to speak with Tom Ryan on the morning of May 28, 2013, in order to discuss social issues and philosophy regarding the Company's operations. No agreements or commitments from SCI resulted from this discussion.

Later in the day on May 28, 2013, the Special Committee and Board met. The Special Committee unanimously recommended that the Board approve the merger. The Board unanimously accepted the recommendation, approved the merger, and recommended that the Company's shareholders approve the merger.

On August 13, 2013, more than 99% of the Company's shareholders voted to approve the merger. At the time of the merger vote, Louisiana law required two-thirds shareholder approval for a merger. La. R.S. 12:112(C)(2)(2013). On December 23, 2013, the FTC issued its decision and order approving the merger and requiring SCI to divest certain listed properties after closing.[6] In May 2014, Potential Seller successfully bid on some of the divested properties located in

---

[6] Some divested properties were located in New Orleans, but these were SCI-operated properties, none that had been Company-operated at the time of the merger.

California, Florida, and Texas. Stewart did not bid on any divested properties. At some point after the merger transaction closed, Stewart made a private investment in Potential Seller, in exchange for less than 5% equity in Potential Seller.

Following discovery in this litigation, Stewart, the Company, and the Named Directors filed motions for summary judgment seeking dismissal of all claims. They argued that they are protected from liability by the business judgment rule, the presumption that they used their business judgment and acted in the best interest of the shareholders such that the courts must not second-guess that judgment. The Shareholder Appellants argued that the business judgment rule does not apply due to conflicts of interest, lack of director independence from Stewart, and insufficient disclosure in the proxy statement. Thus, according to Shareholder Appellants, the business judgment presumption is rebutted and the Company, Stewart, and the Named Directors were required to show that the merger was "inherently fair," which they did not do and thus did not meet their summary judgment burden.

Following a hearing, the District Court granted summary judgment on October 31, 2016. Shareholder Appellants appealed, and following remand from this Court,[7] the District Court rendered an amended judgment on October 18, 2017, which dismissed all claims.[8] This appeal followed.

---

[7] *See Moulton I*, 17-0243, p. 7, 226 So.3d at 573.

[8] This case was again remanded for completion of the record. *Moulton v. Stewart Enterprises, Inc. ("Moulton II")*, 18-0178, p. 2 (La. App. 4 Cir. 11/28/18), 259 So.3d 456, 457. In the instant appeal, the parties agree the record is now complete.

***Summary Judgment Standard***

"Appellate courts review the granting of a summary judgment motion *de novo*." *Jordan v. Cmty. Care Hosp.*, 19-0039, p. 8 (La. App. 4 Cir. 7/24/19), 276 So.3d 564, 574 (citations omitted). In their *de novo* review, appellate courts use the same criteria that govern the district court's determination of whether summary judgment is appropriate. *Id.*, 19-0039, pp. 8-9, 276 So.3d at 574.

"The purpose of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there exists a genuine need for trial." *Id.*, 19-0039, p. 9, 276 So.3d at 574 (quotation and citations omitted). Summary judgment will be granted where, "[a]fter an opportunity for adequate discovery, … the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3). As the Supreme Court explained:

> …[A] "genuine issue" is a "triable issue." ... An issue is genuine if reasonable persons could disagree. If ... reasonable persons could reach only one conclusion, there is no need for a trial on that issue. ... A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery.

*Supreme Services and Specialty Co., Inc. v. Sonny Greer, Inc.*, 06-1827, p. 5 (La. 5/22/07), 958 So.2d 634, 638 (citations omitted).

Articles 966 and 967 of the Louisiana Code of Civil Procedure govern summary judgment motions. Article 966(D)(1) provides for a shifting burden of proof:

> The burden of proof rests with the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.

Article 967 addresses the non-mover's response to a properly supported motion for summary judgment:

> …an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.

La. C.C.P. art. 967(B).

"Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Samaha v. Rau*, 07-1726, p. 5 (La. 2/26/08), 977 So.2d 880, 883 (citations omitted). "Mere speculation will not defeat a motion for summary judgment, and conclusory allegations, improbable inferences, and unsupported speculation are insufficient to support a finding that a genuine issue of material fact exists." *Jordan*, 19-0039, p. 17, 276 So.3d at 579 (internal quotation omitted)(collecting cases).

On appeal, Shareholder Appellants contend that the District Court erred in granting summary judgment and dismissing all claims. They raise two assignments of error as follows:

1. The District Court erred in granting summary judgment by not applying the inherent fairness standard under La. R.S. 12:84, which requires [the Company and the Board] to bear the evidentiary burden on claims for breach of fiduciary duty due to Stewart's direct conflict of interest in the Buyout.

2. Even if the inherent fairness standard does not apply, the District Court erred by granting summary judgment when [Shareholder] Appellants presented substantial evidence demonstrating that the Board acted disloyally and in bad faith.

### Business Judgment Rule

Company, Named Directors, and Stewart sought summary judgment holding that the business judgment rule applies and therefore precludes this Court from overturning their good faith business decisions, which resulted in the formation and operation of a Special Committee and subsequently the approval of the merger.

"Louisiana's business judgment rule provides that as long as directors of a corporation decide matters rationally, honestly, and without a disabling conflict of interest, the decision will not be reviewed by the courts." *Atkins v. Hibernia Corp.*, 182 F.3d 320, 324 (5th Cir. 1999)(citing *Bordelon v. Cochrane*, 533 So.2d 82, 86-87 (La. App. 3 Cir. 1988)).[9] "The phrase 'business judgment rule' describes the basic reluctance of courts to interfere in corporate matters and to substitute their judgment for that of the directors in managing corporate affairs." Glenn G. Morris

---

[9] *See also Watkins v. North American Land & Timber Co.*, 107 La. 107, 31 So. 683, 686-87 (La. 1902); *Percy v. Millaudon*, 8 Mart. N.S. 68, 74, 78 (La. 1829); *Pool v. Pool*, 16 So.2d 132, 134-35 (La. App. 1st Cir. 1943).

& Wendell H. Holmes, 7 La. Civ. L. Treatise, Business Organizations § 22:2 (2020 Update). Commentators have remarked on the "twofold" effects of the business judgment rule: "the court will not enjoin nor set aside a transaction, nor will the directors who approved the transaction be held personally liable for breach of their duty of care as a result of an honest mistake of judgment." *Id.* "Various justifications have been offered for the [business judgment] rule: the recognition by courts of their inherent limitations in business matters and their resulting reluctance to second-guess directors; the realization that directors are fallible and that able persons would be reluctant to serve as directors if the law imposed an unreasonably high degree of foresight; and the fact that many, if not most, business decisions involve an inherent degree of risk-taking." *Id.* (footnotes omitted).

Louisiana has a comprehensive statutory scheme to protect shareholders of corporations from proscribed improper behavior by the individuals that govern them. Court oversight is necessary at times to protect the legitimate interests of those shareholders and protect them from corporate officers and directors who have clear and disabling conflicts of interest. The business judgment rule cautions courts to allow officers and directors flexibility and predictability to make good-faith business decisions without interference. Judicial review should be limited to cases involving dishonest and bad faith business conduct and disabling conflicts of interest. Courts must refrain from undue interference and allow businesses to carry out their corporate matters and provide guidance and review through fair, balanced, and predictable interpretations of the law.

We are reluctant to interfere in the corporate matters involved in this case and refrain from substituting our judgment for that Company's Board of Directors. We review these business transactions guided by principles of fairness and balanced deliberation to achieve predictability and flexibility in the application of our business laws. We find that the directors in this case decided matters rationally, honestly, and without disabling conflicts of interest; thus, we refrain from interfering with the business decisions of the directors as more fully discussed below.

At the time of the merger, Louisiana's business judgment rule was codified in former La. R.S. 12:91 (2013) ("Section 91").[10] Section 91 also governed claims for breach of fiduciary duty. Under Section 91, "[o]fficers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions…" La. R.S. 12:91(A)(2013). "[A] director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner" or acted with "a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty." *Id.*

---

[10] "Effective January 1, 2015, the Business Corporation Law, consisting of La. R.S. 12:1 to 12:178, was repealed and the Business Corporation Act, consisting of La. R.S. 12:1-101 to 12:1-1704 was enacted." *Lopez Languirand v. Lopez*, 18-0245, p. 5, n. 3 (La. App. 5 Cir. 12/12/18), 261 So.3d 1054, 1058 (citing Acts 2014, No. 328). The current version of the business judgment rule is codified in La. R.S. 12:1-831 and 1-832.

13

Under Louisiana's business judgment rule in effect at the time of the merger, a "director or officer who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill … if the director or officer":

> (1) [d]oes not have a conflict of interest with respect to the subject of the business judgment[;]
>
> (2) [i]s informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances[; and]
>
> (3) [r]ationally believes that the business judgment is in the best interests of the corporation and its shareholders.

La. R.S. 12:91(C)(2013).

Section 91 places the burden of proof on the "person alleging a breach of the duty of diligence, care, judgment, and skill owed by an officer or director" to show the "alleged breach of duty" and "that the breach was the legal cause of damage suffered by the corporation." La. R.S. 12:91(E)(2013). The person alleging such a breach of duty likewise has the burden of proving that "Subsection[] C" – the business judgment rule – does not apply. *Id.*

At the time of the merger, Louisiana law permitted corporations to eliminate or limit the personal liability of directors or officers for monetary damages for breach of fiduciary duty by provisions in the articles of incorporation; however, liability could not be limited for any of the following:

- breach of the duty of loyalty.

- acts or omissions not in good faith or which involve intentional misconduct or knowing violation of law.

14

- liability for improper distributions to shareholders.

- liability for any transaction from which the director or officer derived an improper personal benefit.

*See* La. R.S. 12:24(C)(4)(2013).

In the case *sub judice*, it is undisputed that the Company's articles of incorporation included such a provision. Here, Shareholder Appellants' claims on appeal are limited to breach of the duty of loyalty.

### *Inherent Fairness*

Seeking to rebut the application of the business judgment rule, Shareholder Appellants argue in assignment of error number one that the District Court erred in failing to place the burden on the Company and the Board to prove that the merger was "inherently fair." They also contend that genuine issues of material fact remain as to (1) Stewart's alleged self-dealing; (2) whether the Named Directors acted independently from Stewart; and (3) whether the Board withheld material information from shareholders in bad faith.

We first address together Shareholder Appellants' arguments concerning "inherent fairness" and "self-dealing," both of which stem from former La. R.S. 12:84 (2013) ("Section 84").[11] Shareholder Appellants contend that, in order to prevail on summary judgment, Section 84 imposed on the Company and the Board the burden to prove that the merger was "inherently fair." They argue that the Company and the Board failed to meet such burden and were not entitled to summary judgment. Shareholder Appellants' argument characterizes Stewart as an

---

[11] *See* n. 10, *infra*. Under the current Business Corporation Act, La. R.S. 1-860 through 1-863 govern interested director transactions.

"interested director." At the time of the merger, Section 84 governed transactions with "interested directors."[12]

One court explained the interplay between Section 91 and Section 84, stating that Section 91 "places the burden of proof in a breach of fiduciary duty claim on the person seeking to establish that claim" while Section 84 "sets forth certain standards by which an interested director may enter into a transaction beneficial to himself or herself." *Guillory v. Broussard*, 15-953, p. 9 (La. App. 3 Cir. 5/4/16), 190 So.3d 486, 493 (quoting *Duncan v. Moreno Energy, Inc.*, 13-668, p. 15 (La. App. 3 Cir. 12/11/13), 129 So.3d 849, 858). "An interested director bears the burden of proving his good faith in entering into the contract as well as the inherent

---

[12] Section 84 is entitled "Interested directors; quorum" and provides in its entirety:

A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:

(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or

(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or

(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.

B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction.

16

fairness of the contract from the standpoint of the corporation." *Duncan*, 13-668, p. 15, 129 So.3d at 858 (quoting *Church Point Wholesale Beverage Co. v. Voitier*, 97-0650, p. 9 (La. App. 3 Cir. 1/14/98), 706 So.2d 1015, 1019)(other citations omitted). "This requires the [interested] director to prove that the contract was essentially an arm's length transaction." *Id.*[13]

Section 84 "was designed to deal with an early jurisprudential rule that made transactions between a corporation and one of its directors automatically voidable at the option of the corporation." Glenn G. Morris, Model Business Corporation Act As Adopted in Louisiana, 75 La. L. Rev. 983, 1028 (2015).[14] Under Section 84, an "interested director transaction" is not "automatically void" if:

> 1) it is authorized by vote only of the disinterested directors, or 2) it is approved in good faith by vote of the shareholders who have knowledge of the material facts as to the directors' interest and the transaction, or 3) the transaction was fair to the corporation as of the time it was authorized, approved, or ratified by the board of directors or shareholders.

*Olinde v. 400 Grp.*, 95-1233, pp. 4-5 (La. App. 1 Cir. 12/6/96), 686 So.2d 883, 885.

---

[13] The Louisiana Supreme Court described an "arm's length" transaction as one in which "the transaction is in good faith and the consideration paid is adequate." *Noe v. Roussel*, 310 So.2d 806, 817 (La. 1975)(quoting *Gen. Motors Acceptance Corp. v. Hahn*, 190 So. 869, 871 (La. App. 2d Cir. 1939)). "In these 'arms-length' transactions, the corporation is treated the same way that an unrelated person might be treated and receives neither favored nor disfavored treatment." Glenn G. Morris & Wendell H. Holmes, 7 La. Civ. L. Treatise, Business Organizations § 22:3 (2020 Update).

[14] Professors Morris and Holmes likewise commented that "[m]any self-dealing transactions between a corporation and one or more of its directors are undoubtedly beneficial to the corporation," for example, "where a director made assets available to the corporation at cost, rendered managerial services without demanding compensation, arranged for another business entity controlled by the director to make available goods or services at a favorable price, or cosigned corporate notes to assist the corporation in obtaining needed capital." Glenn G. Morris & Wendell H. Holmes, 7 La. Civ. L. Treatise, Business Organizations § 22:3 (2020 Update).

Former Title 12 contains no definition for an "interested director." Paragraph A of Section 84 explicitly governs the following scenarios:

- "contract or transaction between a corporation and one or more of its directors or officers"

  or

- "contract or transaction … between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest"

La. R.S. 12:84(A)(2013).

Louisiana jurisprudence has also applied Section 84 where a director secured in the transaction unique financial benefits that were not shared equally with all shareholders. *See Donaldson v. Universal Eng'g of Maplewood, Inc.*, 606 So.2d 980, 988-89 (La. App. 3d Cir. 1992). Louisiana courts also refer to interested director transactions as "self-dealing." *Id.* at 988. Delaware courts, interpreting a Delaware statute similar to Section 84,[15] have described an interested director as one who stood on "both sides of the transaction." *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994).

On appeal, the Company and the Board contend that Section 84 does not apply to the uncontested facts of this case. We agree. The transaction in dispute is the merger between the Company and SCI, two independent public companies. Stewart was not a director or officer of SCI. No evidence exists that Stewart had a financial interest in SCI at the time of the time of the merger. The record

---

[15] Compare 8 Del. C. § 144 (2010).

demonstrates that, as part of the terms of the merger, SCI was required to represent to the Company that SCI had no agreement with Stewart whereby Stewart received any benefit in addition to or different from that received by all other Company shareholders from SCI.

Shareholder Appellants argue that Section 84 applies to Stewart's alleged attempt to purchase certain favored properties that the combined entity may be required to divest to obtain antitrust approval of the merger. They claim that Stewart told the 2008 Board of Directors that he would vote down any merger that did not provide him the ability to acquire the divested properties. Nevertheless, no merger was accomplished at that time, as SCI withdrew its offer in the wake of the collapse of the national credit market. Shareholder Appellants argue that Stewart then partnered with Potential Seller in an effort to acquire properties he expected SCI to divest, thereby securing unique financial benefits not shared by other shareholders through the merger. They claim that Stewart began discussions with Potential Seller about acquiring divested properties while the Special Committee's deliberations were ongoing.

The record evidence provides no support for this theory. Potential Seller had no role in the merger between the Company and SCI. Rather, after the merger closed, Potential Seller successfully bid on certain divested properties. It was only after completion of the merger that Stewart invested in Potential Seller. Stewart testified that he first spoke with Potential Seller's CEO about investing after the

merger closed.[16] We find no law equating a director's post-merger investment in a third party to an unlawful business transaction.

Shareholder Appellants offer no evidence that Stewart secured any personal or financial benefits in the merger not shared equally with the other shareholders. Their contentions that Stewart was self-dealing and secured special arrangements in the merger are based solely on conclusory statements and speculation. Mere conclusory allegations, improbable inferences and unsupported speculation do not create a genuine issue of material fact and are insufficient to satisfy an opponent's burden of proof to defeat summary judgment. *Seals v. Franklin Ave. Baptist Church of New Orleans, LA*, 19-0123, p. 6 (La. App. 4 Cir. 11/20/19), 286 So.3d 581, 585 (citing *Sears v. Home Depot, USA, Inc.*, 06-0201, p. 12 (La. App. 4 Cir. 10/18/06), 943 So.2d 1219, 1228).

We nevertheless find it useful to discuss the facts of cases wherein Section 84 was applicable. In *Donaldson*, 606 So.2d 980, a president-majority stockholder of a corporation that owned a country club, negotiated a sale of the country club and obtained (through a real estate agency wherein president-majority stockholder was sole owner) a commission on the sale of the club. In doing so, the appellate court found, the president-majority stockholder failed to meet his burden to prove that the commission was fair to the corporation and that it was an "arms-length" transaction.

---

[16] Shareholder Appellants point to other testimony by Stewart that his "interest in [Potential Seller] originated when we were trying to acquire them and I was still on the Board…. That's when the discussion started." This testimony does not show that Stewart had any arrangement with Potential Seller to then bid on whatever divested properties Stewart wanted in exchange for Stewart's investment.

In *Noe v. Roussel*, 310 So.2d 806 (La. 1975), the selling corporation, in which defendant was an officer, director, and majority owner, sold assets to the purchasing corporation, in which same defendant was an officer, director, and 99% owner. The Supreme Court rejected the defendant's contention that this was an arms-length transaction, noting that it was "inconceivable" that the defendant, as 99% owner of the purchasing corporation, "did not dictate the terms of [the purchasing corporation's] offer."

Section 84 likewise applied to hunting contracts in *Woodstock Enterprises, Inc. v. Int'l Moorings & Marine, Inc.*, 524 So.2d 1313, 1316 (La. App. 3d Cir. 1988) where it was stipulated that "the majority of IM & M shareholders were also shareholders of Woodstock, Inc." The court found failure to comply with Section 84 where there was no evidence that shareholder approval was solicited on the hunting contracts, and "hunting contracts executed between IM & M and Woodstock were a great advantage to Woodstock and the common directors and officers and a great expense to IM & M."

The facts of these cases are readily distinguishable, as each examines transactions involving common officers, directors, or shareholders on both sides of the transaction. No evidence of such facts is present here. Stewart is not an interested director as provided in Section 84. We, thus, discern no reason to apply Section 84 to the facts before us on this appeal.[17] In summary, the first assignment of error lacks merit.

---

[17] Shareholder Appellants cite to financial expert reports, both from their own expert and Goldman Sachs' pre-merger valuation, projecting future increases in stock price under certain

*Duty of Loyalty*

We next consider Shareholder Appellants' second assignment of error. They argue that, even if Section 84 does not apply, genuine issues of material fact remain regarding their theories of liability as to breach of loyalty. They raise three arguments in this respect.

**1.** *Conflict of Interest*

First, they reiterate their claim that Stewart engaged in self-dealing by seeking to purchase assets that SCI may be required to divest to obtain FTC approval of the merger. Under this first argument, they contend that Stewart had a conflict of interest in the merger, such that the business judgment rule does not apply.

Section 91 gives a director the benefit of the business judgment rule where he does not have a conflict of interest with respect to the subject of the business judgment, is informed with respect to the subject of the business judgment, and rationally believes the business judgment is in the best interest of the corporation and shareholders. La. R.S. 12:91(C)(2013).[18] While neither Section 91 nor former Title 12, more generally, define "conflict of interest," the definition developed in jurisprudence explains that directors owe a fiduciary duty to the corporation and shareholders, and that a fiduciary cannot take advantage of his position for his personal benefit to the detriment of the corporation or its shareholders. *Spruiell v.*

---

scenarios assuming no merger had occurred. As Section 84 does not apply, the Company and the Board do not bear the burden to prove inherent fairness of the merger. These future projections therefore do not raise any genuine issue of material fact as to whether the merger was fair.

[18] Shareholder Appellants make no claims as to the last two grounds.

*Ludwig*, 568 So.2d 133, 141 (La. App. 5th Cir. 1990); *Olinde*, 95-1233, p. 4, 686 So.2d at 885 (citing *Noe*, 310 So.2d at 819). A fiduciary "is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent." *Noe*, 310 So.2d at 819. We note that this line of jurisprudence interprets Section 84, which governs interested directors. *See also Foster v. Blackwell*, 98-1654, pp. 29-30 (La. App. 3 Cir. 11/24/99), 747 So.2d 1203, 1220; *Church Point Wholesale Beverage Co.*, 97-650, pp. 8-9, 706 So.2d at 1019-20. Professors Morris and Holmes have referred to interested director transactions and "conflict-of-interest" transactions interchangeably. Glenn G. Morris & Wendell H. Holmes, 7 La. Civ. L. Treatise, Business Organizations § 22:3 (2020 Update).

We have already found that Stewart was not an interested director. Our research has not revealed any Louisiana cases discussing a director's conflict of interest, other than those where the director was "interested" pursuant to Section 84.

Shareholder Appellants rely on a Delaware case, *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 433-34 (Del. Ch. 2012), wherein the CEO of a selling corporation singlehandedly negotiated a merger with the purchasing corporation wherein the CEO learned that purchasing corporation intended to sell off a portion of the selling corporation's assets. Without telling the selling corporation's board, the CEO worked with other selling corporation managers to make a bid on those assets after he negotiated the merger. The Delaware court stated that when the CEO "was supposed to be getting the maximum price from [purchasing

corporation], he actually had an interest in not doing that." *Id.* at 434. Due to this, among other compounding circumstances, the Delaware court was persuaded that shareholder-plaintiffs had a "reasonable likelihood of success in proving that the [m]erger was tainted by disloyalty" but denied an injunction of the shareholder vote on the proposed merger. *Id.*

Stewart argues that the facts of *El Paso* are not present or even similar to the circumstances in the SCI merger. We agree. Stewart did not negotiate the merger; indeed, the Special Committee insulated him from doing so. Stewart did not bid on any assets that SCI divested; Potential Seller did. Stewart merely invested in Potential Seller after the merger closed.

Shareholder Appellants also contend, under Delaware law, that an officer or director can be liable for having acted on a conflict of interest and breached his duty of loyalty to shareholders, even though the remaining directors were found to have no liability. In *In re Dole Food Co., Inc. Stockholder Litig..*, No. 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015), the CEO, who was also the controlling stockholder, negotiated with a special committee to purchase all publicly owned stock that he did not already possess. The Delaware court found that the CEO, with assistance from president/COO, committed fraud, provided the special committee with "lowball management projections," and "made false disclosures" designed to drive down the public stock price. The court found that these actions deprived the special committee "of the ability to negotiate on a fully informed basis" and potentially say "no" to a sale.

Here, we find no evidence that Stewart misled the Special Committee or did anything to deprive it of the ability to negotiate on a fully informed basis. Indeed, the District Court found that the evidence shows that the Special Committee members "disregarded any suggestions made by Stewart."

We also find no guidance from *Chen v. Howard-Anderson*, 87 A.3d 648 (Del. Ch. 2014), wherein summary judgment was denied as to a CEO and CFO, because an exculpatory provision protected only directors pursuant to Delaware law, but provided no such protection to the CEO and CFO in their capacity as officers.

Here, in contrast to the cited cases, all record evidence reveals that Stewart wanted something that it was not possible for him to have and that no one was willing to sell him. Stewart voted along with 99% of the shareholders approving the merger and thereafter used those proceeds to make other investments with third parties. Considering the particular undisputed facts of this case, we simply cannot conclude, under Louisiana corporate law as it existed at the time of the merger, that Stewart's personal hopes and dreams that never came to pass were a conflict of interest under former Title 12. We are likewise unpersuaded by the Delaware cases on which Shareholder Appellants rely as the facts are significantly different, and we find no genuine factual dispute remains that would require resolution of Shareholder Appellants' self-dealing claim at trial.

## 2. *Board Independence*

Shareholder Appellants next argue that the business judgment rule does not apply because Stewart compromised the integrity of the Special Committee deliberations. They contend that Stewart controlled or influenced the Special Committee's business judgment such that they were unable to act independently of Stewart's interests. This argument stems from a line of Delaware cases, wherein directors were found to have breached their duty of loyalty because they were unable to act independently of a controlling shareholder. Shareholder Appellants suggest that genuine issues of material fact remain as to whether the directors on the Special Committee were sufficiently "independent" of Stewart and whether Stewart was a "controlling" shareholder.

Louisiana lacks any cases defining an "independent" director. All parties cite to Delaware cases in this regard. In Delaware, director independence refers to a director's ability to "exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). Stated otherwise, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id.* (citation omitted). Directors are presumed to be independent. *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014), *overruled in part on other grounds*. "To show that a director is not independent, a plaintiff must demonstrate that the

director is 'beholden' to the controlling party 'or so under [the controller's] influence that [the director's] discretion would be sterilized.'" *Id.* (quoting *Rales*, 634 A.2d at 936). "[M]ere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence." *Id.* (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004)). Rather, in Delaware, the plaintiff must show the director had "material" ties to the controlling party such that he cannot objectively fulfill his fiduciary duties; "the question is whether those ties are material, in the sense that the alleged ties could have affected the impartiality of the director." *MFW*, 67 A.3d at 509-10 (citing *Cede*, 634 A.2d at 363). As at least one Delaware court described, the correct standard for materiality is not a "reasonable person" standard; rather, it is an "actual person" – the director in question – such that it is "necessary to look to the financial circumstances of the director in question to determine materiality." *MFW*, 76 A.3d at 510 (citing *Cede*, 634 A.2d at 364). Thus, to show a director's independence was compromised by factors material to him, a plaintiff is required to show evidence of the director's actual economic circumstances. *See id.*

The parties' arguments also look to Delaware cases concerning whether Stewart was a "controlling" shareholder. Delaware law provides two scenarios under which a shareholder could be found a "controller": where the shareholder "(1) owns more than 50% of the voting power of a corporation or (2) owns less

27

than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'" *In re Rouse Properties, Inc.*, No. 12194-VCS, 2018 WL 1226015, at *11 (Del. Ch. Mar. 9, 2018)(quoting *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015)); *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994). Under this second scenario, a minority shareholder "is not considered to be a controlling stockholder unless it exercises 'such formidable voting and managerial power that [it], as a practical matter, is no differently situated than if [it] had majority voting control." *In re Morton's Rest. Gp. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (citation omitted). His "power must be so potent that independent directors cannot freely exercise their judgment, fearing retribution from the controlling minority blockholder." *Id.* One court found it reasonable to infer that a defendant dominated board members through "a pattern of threats aimed at intimidating" board members, rendering them non-independent for the purposes of voting. *New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, No. 5334-VCN, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011)(threatening litigation if board members did not take actions to sell the company).

While Delaware law is persuasive, it provides us with little guidance on assessing director independence under Louisiana's former Title 12. Here, we resolve this issue, as did the District Court, by finding under the undisputed facts that Stewart was not a controlling shareholder. It is undisputed that Stewart neither

owned a majority of shares, nor controlled a majority of voting power through his holdings in the Company. Rather, his voting power provided him the ability to block any action he disfavored through a negative vote.[19] No evidence exists, however, that Stewart's holdings or voting power permitted him to force or dominate any board action.

No evidence was produced proving that Stewart participated in or interfered with the deliberations of the Special Committee. As Company and Named Directors point out, Shareholder Appellants' arguments that Stewart and McNamara[20] "ousted" former directors McFarland and Read from the Board in 2011 (while "recruiting" other Board members) and that former Company CEO Thomas Crawford resigned in 2011 due to disputes with Stewart provide no evidence that Stewart dominated and controlled the 2013 Special Committee when it negotiated and approved the sale to SCI. There is also no evidence that Stewart was so difficult as chairman that the Board voted to sell the Company to eliminate Stewart's overhang. The record likewise lacks any evidence that Stewart threatened or intimidated the Special Committee. It was undisputed that the Special Committee instructed Stewart not to communicate with SCI until the terms of the merger were fully negotiated, and Stewart complied. While the Special Committee

---

[19] At the time of the merger, La. R.S. 12:112(C)(2)(2013) required a two-thirds vote of shareholders to approve a merger.

[20] We also find no evidence that McNamara, a nonparty, compromised or impeded Special Committee deliberations either on his own or on Stewart's behalf. Shareholder Appellants provide only argument without evidence for their claim that Named Directors' unawareness of McNamara's compensation and advisory agreement with Stewart, which rewarded McNamara for increased Company share price, affected Special Committee or Board decision-making in any way.

inquired as to Stewart's position, whether he would vote for a sale at a share price of $13.00, this does not support Stewart's control over the sale process; instead, the Special Committee recognized Stewart's ability to block the sale through his negative vote and informed themselves as to whether Stewart would vote "no" to the merger. Considering Stewart's minority voting position, the Special Committee and the Board could also say "no" to the merger. Shareholder Appellants set forth mere allegations and conclusory statements without proof, which is wholly "insufficient to support a finding that a genuine issue of material fact exists." *See Jordan*, 19-0039, p. 17, 276 So.3d at 579.

Shareholder Appellants' claims as to the Board's independence turn on Stewart's controller status. As we find no evidence that Stewart was a controlling shareholder, it is unnecessary for us to reach whether the Board acted independently of his control. This argument is without merit.

### 3. *Proxy Statement*

Shareholder Appellants lastly argue that the Board breached its fiduciary duty by withholding material information in the proxy statement on which shareholders relied in voting on approval of the merger. In *Feiber v. Cassidy*, 98-0405, p. 6 (La. App. 1 Cir. 12/28/98), 723 So.2d 1101, 1105, the Louisiana First Circuit adopted the standard set forth by the United States Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 238, 108 S. Ct. 978, 986-87, 99 L. Ed. 2d 194 (1988), holding that a director's or officer's duty of disclosure to an investor is limited to information he possesses that is material to the transaction.

> Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information. The standard does not vary because the insider may have profited. *Basic Incorporated v. Levinson*, 485 U.S. at 240, n. 18, 108 S.Ct. at 988, n. 18. Moreover, the mere fact that an investor may find information interesting or desirable is not sufficient to satisfy the materiality requirement. Information is material only if its disclosure would alter the "total mix" of facts available to the investor and if there is a substantial likelihood that a reasonable shareholder would consider it important to the investment decision. *Milton v. Van Dorn Company*, 961 F.2d 965, 969 (1st Cir. 1992).

*Feiber*, 98-0405, pp. 6-7, 723 So.2d at 1105. The U.S. Supreme Court likewise explained in *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976):

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.… It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.

No other Louisiana cases have interpreted *Basic*, *TSC*, or otherwise discussed the materiality requirement. Shareholder Appellants cite to two Delaware cases for their argument that Company and Board were required to disclose, and failed to disclose, to shareholders potential conflicts of interest and "economic arrangements" that may differ from that other shareholders may receive in the merger. *See Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 15 (Del. Ch. 2002); *Maric Cap. Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010).

Shareholder Appellants point to nondisclosures associated with Stewart's alleged conflicts of interest and the Board's alleged lack of independence from Stewart. These include Stewart's desire to purchase divested properties (which did not occur); Stewart's post-merger investment with Potential Seller (which had not occurred at the time of the shareholder vote); Stewart's advisory agreement with McNamara; McFarland's and Read's resignation from the Board, Elstrott's and Saer's recruitment to the Board on McNamara's recommendation (which was disclosed in Company's public filings to the Securities and Exchange Commission); and Elstrott's and Stewart's mutual investment in a third party company.

We have already determined that Shareholder Appellants have not shown, as a matter of law, that Stewart acted on any conflict of interest recognized under Louisiana's former Title 12 or that the Board or Special Committee lacked independence from Stewart. Considering our conclusion, we find no reason to deem these nondisclosures material to a reasonable investor, and Shareholder Appellants supply us with no support in law or evidence. We find that under Section 91, the burden to show a breach of fiduciary duty, including the duty to establish the materiality of nondisclosures fell to Shareholder Appellants, and they have failed to show any material factual dispute as to said breach of duty. This assignment lacks merit.

Consequently, we find, as the District Court did, that Shareholder Appellants claims failed to present evidence sufficient to raise any genuine issue of material

fact and overcome the business judgment rule. In the absence of such evidence, the Company and the Board were entitled to summary judgment dismissing the claims against them.

Accordingly, for these reasons, we affirm the judgment of the District Court.

**AFFIRMED**